UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20557-Civ-SEITZ
        (07-20338-Cr-SEITZ)
MAGISTRATE JUDGE P. A. WHITE

EUGENE RUSSELL,                    :

        Movant,                    :

v.                                 :          **SUPPLEMENTAL**
                                       **REPORT OF MAGISTRATE JUDGE**
                                   :      **AFTER EVIDENTIARY HEARING**

UNITED STATES OF AMERICA,          :

        Respondent.                :

_____

## I    INTRODUCTION

Movant Eugene Russell filed a timely _pro se_ motion to vacate pursuant to 28 U.S.C. §2255, attacking, on multiple grounds, his convictions and sentences entered in 07-20338-Cr-SEITZ after trial by jury. (Motion Cv:DE1; Memo Cv:DE7 with Exhibits A-C). A prior Report (Cv:DE17) recommended denial of Russell's §2255 Motion on all grounds.[1] As discussed below in Section "II" of this Supplemental Report, the Matter has been Re-Referred to the undersigned by the Honorable Patricia A. Seitz, United States District Judge (Order, Cv:DE22) for an Evidentiary Hearing and further Report and Recommendation on limited grounds: sub-claims "I(1)" and "I(2)" of the §2255 Motion, related to an alibi defense [announced by counsel but then abandoned] which Movant Russell contends his attorney, Neil Michael Nameroff, Esquire, should have pursued. On all other grounds, the Court adopted the Report (Cv:DE17) and denied §2255 relief.

### Procedural Background in the Underlying Criminal Case

Russell's convictions stemmed from an investigation of him and a co-defendant, Dwighte Morley, commenced by the Drug Enforcement Agency ("DEA") in October 2006, after a confidential source indicated that they were arranging to smuggle drugs into the United States

_____

[1] At its inception, this Cause was referred to the undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2255 Cases in the United States District Courts.

("U.S.") from Bimini, in the Bahamas. Surveillance of Russell and others by DEA agents, and by officers from U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and City of Miami Police Department ("MPD"), led to the belief that the drugs were to arrive on a boat owned by Phillip Taylor for delivery in an area of Coconut Grove in Miami, on Royal Road which dead-ends at the Biscayne Bay seawall.

Based on the DEA investigation, Russell, and Dwighte and Derrick Morley [twins], were charged by Indictment with: Count 1, conspiracy to import 100 kilograms or more of marijuana into the U.S., in violation of 21 U.S.C. §§952(a), 963, 960(b)(2); Count 2, knowingly and intentionally importing 100 kilograms or more of marijuana into the United States, in violation of 21 U.S.C. §§952(a), 960(b)(2), and 18 U.S.C. §2; Count 3, conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§846, 841(a)(1), and (b)(1)(B); and Count 4, knowingly and intentionally possessing with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§841(a)(1), (b)(1)(B), and 18 U.S.C. §2. (Indictment, Cr:DE1).

Russell and Dwighte Morley were tried jointly, and jointly appealed, having both been found guilty as charged on all counts, with jury findings as to both of them that 100kg or more of marijuana was involved in each count (Verdicts: Russell, Cr:DE115; Dwighte Morley, Cr:DE116). Russell was sentenced to four concurrent 121-month sentences. (Cr:DE154). Dwighte Morley received four concurrent 41-month sentences. Their convictions and sentences were affirmed by the Eleventh Circuit on 11/17/09. (Cr:DE202; United States v. Dwighte Morley, Eugene Russell, No. 08-14666, 353 Fed. Appx. 256, 2009 WL 3824790 (11 Cir., Nov. 17, 2009)). Evidence at trial established that the marijuana was brought in by boat, and was off-loaded at the Coconut Grove sea wall on the night of 1/23/07.

2

Derrick Morley pled guilty to Count 1, pursuant to a written plea agreement. (07-20338-Cr-SEITZ, Cr:DEs 93-95, 136). A separate 4-Count Indictment, in a separate case (07-20065-Cr-Huck, Cr:DE21), charged Russell's and Dwighte Morley's other co-conspirators [Delton Edward Cash, Lamardo King, Freedman Rodney Robbins, Rocky Roberto Saunders, and Phillip Taylor].

Cash, King, Robins, and Saunders each pled guilty to Count 1, conspiracy to import 100kg or more of marijuana. Cash and King received 30-month prison terms; and Robins and Saunders received 37-month terms. Taylor went to trial, was found guilty as charged on all counts, and was sentenced to four concurrent 96-month terms.

## II   THE PRIOR REPORT (Cv:DE17) AND MOVANT'S OBJECTIONS (Cv:DE20); THE ORDER OF PARTIAL ADOPTION AND RE-REFERRAL (Cv:DE22), AND MATTERS RELATING TO THE EVIDENTIARY HEARING

### A. The Prior Report, and Objections

Movant Russell's §2255 Motion raised 5 Grounds (incorporating 18 sub-claims).

At noted in the prior Report (Cv:DE17), and the Court's Order of Re-Referral (Cv:DE22), Movant Russell filed three affidavits with his Memorandum (Cv:DE7). These were Russell's own Affidavit, signed 3/11/11 (Ex.A, at Cv:DE7 p.36); and two unexecuted Affidavits in the name of Russell's wife, Marcia [Marcia McDowell-Russell] (Exs. "B" and "B-1," filed respectively at Cv:DE7 p.8, and Cv:DE7 pp.40-41).[2]

**Movant Russell's signed affidavit** stated that he told Attorney Nameroff he was innocent, because he was home suffering from Gout on January 23, 2007. Russell stated that he told Mr. Nameroff to

---

[2]   Some documents in this case, including the prior Report (Cv:DE17), referred to the Movant's wife by the name "Marsha," but it appears that her correct name is "Marcia."

"investigate all witnesses" and gave him the names of four persons: (1) his wife Marcia who "was present;" (2) his wife's sister Sherrie M. McIntosh who "was assisting me with my gout;" (3) his wife's "other" sister who "was also present on the date of January 23;" and (4) "also Vincent Jenkins."

**The first unexecuted Affidavit in Marcia McDowell-Russell's name (Ex.B)** stated: when she got home at 5:00 p.m. on 1/23/2007 her daughter Aaliya and nephew Vincent Jenkins were with defendant Russell; SHERIE arrived at 6:00 p.m. to check on Russell's gout, and stayed until about 10:00 p.m. when American Idol (on TV) was over; her sister SANDRA came over to to spend time with us, and watch American Idol on televison with the family." The Affidavit (Ex.B) also stated that "after midnight on 1/24/2007, we went to sleep."

**The second unexecuted Affidavit in Marcia McDowell-Russell's name (Ex.B-1),** repeated the essence of the first unexecuted Affidavit, <u>and also stated</u> that after her husband's arrest she met with Attorney Nameroff and told him: that she, her daughter Aaliyah[3] and nephew Vincent, and her sisters Sherrie and Sandra, were present with defendant Russell at the Russell home on the night of 1/23/2007, that they watched American Idol together until it was over at about 10:00 p.m.; and that she [Mrs. Russell] "stayed with my husband until we both went to sleep just after midnight." <u>The Affidavit further states</u> that: Attorney Nameroff said he was planning to use an Alibi defense, that Nameroff took the phone numbers for Marcia McDowell-Russell's sisters and said he would call them; that Nameroff told Mrs. McDowell-Russell to be at trial, and that he told her he had spoken with Sherrie and Sandra and that they

---

[3]     While the Russells' daughter's name was spelled "Aaliyah" in the affidavits authored in Mrs. Marcia McDowell-Russell's name (Exs. B and B-1 submitted by Movant Russell in support of his §2255 Motion), and she was therefore referred to by the name "Aaliyah" in the prior Report (Cv:DE17) and the Court's Order thereon (Cv:DE22), Mrs. McDowell-Russell at the 8/29/2012 Evidentiary Hearing indicated that the spelling of her daughter's name is in fact "Aliah."

would be called to testify; but when Mrs. McDowell-Russell called her sisters, one of them (Sandra) said she had not heard from Nameroff, and when she [Mrs. McDowell-Russell] called to confront Nameroff, he told her "to not worry and that he had a 'rock solid alibi defense.'"

Upon consideration of the record, which included Russell's Affidavit (Ex.A), and the two unexecuted Affidavits drafted in Mrs. Russell's name (Exs. B and B-1), it was recommended in the prior Report (Cv:DE#17) that §2255 relief be denied on all grounds/sub-claims.

In pertinent part, the Report recommended denial of relief on the alibi-related subclaims, I(1) & I(2), because based on the evidence in the case it appeared that it was a reasonable strategic decision for trial counsel (Mr. Nameroff) to abandon the Alibi defense that he was initially anticipated, and instead rely on other approaches.[4] The prior Report further recommended that the Court

---

[4]    The prior Report (Cv:DE17) noted that although counsel [Mr. Nameroff] had abandoned the alibi defense, Mr. Nameroff took other approaches.  In this regard, it was observed that:

> ...Counsel...through cross-examination of government witnesses, attempted to diminish the validity of their testimony: for example, trying to portray Cash [who had made a plea deal on the charges in a separate case] as a criminal who could not be believed (Cr:DE175 T/118-153); questioning Saunders [who also had plead guilty] regarding motives he could have for testifying against Russell (Cr:DE176 T/73-81); questioning Agent Morgan, eliciting affirmative responses from him when asking if it were true that among perhaps a hundred photos of 5 or 6 people from 1/19 to 1/23/07 "there's no photograph of Eugene Russell that you put to any of your exhibits; is that correct?," and asking "[a]nd there is no phone call documented in any of those exhibits at any time attributable to Eugene Russell?" (See Cr:DE192, T/82). Also, on cross-examination of Detective Valentin [who on direct had stated that he did not see the boat driver's face, but could see that he was a heavyset black male] Counsel sought to reinforce that lack of certainty that it was Russell who piloted the boat away after it was unloaded, questioning Valentin about lighting, his proximity to the vessel, etc. (Cr:DE194, T/78-100).

deny relief because there was overwhelming evidence at trial of Movant Russell's guilt,[5] and it did not appear that there was a

---

Finally, it is noted that Nameroff did call Sherie McDowell-McIntosh (Cr:DE192, T/117-133; Cr:DE193, T/84-85, 86-88), and Rocky Sanders (Cr:DE193, T/114-131, 133-136) as witnesses for the defense.

(Report, Cv:DE17, at pp.12-13)

[5]     In the prior Report (Cv:DE17) evidence against Movant Russell was summarized, as follows:

As noted in the Eleventh Circuit's opinion, affirming Russell's and Dwighte Morley's convictions, evidence at trial indicated that after 4:00 or 5:00 p.m. on 1/23/07 members of the conspiracy began to meet up in Miami, some arriving by vehicle. Others (Russell, Saunders, and Robins) arrived in the boat which contained the marijuana. Land-based members were at the dead-end road by about 9:00 p.m., waiting. MPD Detective Valentin, who established surveillance of Royal Road between 8:00 and 9:00 p.m., observed the boat-to-van offloading operation, and testified that less than ½ minute after the van loaded with the marijuana drove away, the driver of the boat took off in the vessel ("put the pedal to the metal and took off"). Valentin was close enough to read the boat registration number, FL00235MM, for which he called out a BOLO. DEA Agent Bleier, who arrived at the West end of Royal Road, and established surveillance there at about 10:00 p.m., testified that about 10 to 15 minutes later he saw a burgundy colored van driving West on Royal road, as he was traveling Eastbound towards the offload site. He turned on his police lights, and as the van approached him it started swerving, lost control, and collided with his police car. The occupants fled on foot. A subsequent search of the van showed that it contained approximately 300 kilograms of marijuana. Ice Agent Perez testified that on 1/24/07, Taylor's boat was found floating, tied up to a pier on the West side of Biscayne Bay, with the engine still in the water, as if the boat had just arrived; and ICE Agent Samples, who assisted in processing the boat, testified that a prescription pill bottle, with the name Eugene Russell on it, was found lying on the floor of the boat. Cash's testimony placed Russell, Saunders and Robins on the boat when it first arrived at the sea wall; and Saunders' and Cash's testimony indicated that after the unloading of parcels into the van, Russell stayed on the boat, and the rest of them got into the van. DEA Agent Morgan, an intelligence research specialist, testified in pertinent part, that he analyzed cell phone records in the case, testified regarding the use of phones subscribed to by Cash, King, the Morley Twins, and "Ian White" (which according

6

reasonable probability that the outcome of the proceeding would have been different, but for the error which Movant claims Mr. Nameroff committed.

Russell filed objections to <u>some</u> grounds (Cv:DE20), and also filed a Motion for Evidentiary Hearing (Cv:DE21). In pertinent part, in his Objections, Russell asserted that the Report [Cv:DE17] made conclusory, unsupported statements about trial counsel's reasoning for abandoning the alibi defense; and he argued that the evidence against him at trial was not strong, and that Eleventh Circuit precedent did not support the recommendations of the Report. (Objections, Cv:DE20). In her Order (Cv:DE22), Judge Seitz Adopted the Report and Recommendations as to all but two sub-claims, the alibi-related subclaims "I(1)" & "I(2)" from Ground I of the Motion.

## B.  **The Re-Referral**

### 1.  **Claims Set for the Evidentiary Hearing**

In her Order (Cv:DE22), the Honorable Patricia A. Seitz, United States District Judge, has re-referred this Matter to the undersigned for an Evidentiary Hearing, and Supplemental Report, limited to Movant's Subclaims 1 and 2 from Ground I of his §2255

---

to Saunders was the alias that Russell used to buy phones for his [Russell's] and Taylor's use). Between 6:48 and 10:40 p.m. on 1/23/07, among one of the Morley's phones, and those used by Cash, King, and "Ian White" there were about 30 calls, all but two of which were answered. The calls were 14 seconds to almost 4 minutes in length. As the evening progressed, calls moved Southward, and then remained in the vicinity of the offload site; the phones first pinging off Cell Tower 143, just Northeast of Royal Road on the coast, and thereafter pinging off Cell Tower 16, located about 3 miles North of Royal Road, also on the coast. At 10:36 and 10:40 p.m., when Morley placed calls to Russell's ("Ian White's") phone, Russell's phone was pinging off Tower 16. Morgan testified that just before 1:00 a.m. of 1/24/07, there was a cell phone call from Russell's cell phone to a phone belonging to his wife, Marcia.

(Report, Cv:DE17 at pp.8-9)

Motion.  These two claims are:

1. **§2255 Ground "I(1)":** trial counsel was ineffective in failing to raise an alibi defense at trial after indicating he would do so.

2. **§2255 Ground "I(2)":** trial counsel was ineffective in failing to properly investigate, pre-trial, Petitioner's alibi defense in that counsel only interviewed 2 out of the 4 witnesses that could testify Petitioner was home on the night of the crime.

## 2. District Court's Findings, On Re-Referral for Evidentiary Hearing

In re-referring this matter for further proceedings, Judge Seitz cited pertinent Eleventh Circuit cases, stating, as follows:

> The Eleventh Circuit has held that "if counsel made the decision not to call [the alibi witness] for strategic reasons - if, for example, he spoke with [the alibi witness] and decided that his (or her) testimony would not be helpful or would not [be credible] - then this court would not provide relief for such strategic decisions by counsel." Forrest v. Florida Dep't of Corr., 342 Fed. Appx. 560, 563-64 (11th Cir.2009) (citing Walter v. Thomas, 46 F.3d 1506, 1512 (11th Cir.1995)). However, [w]hen a defense counsel fails to investigate his client's only possible defense, although requested to do so by him, and fails to subpoena witnesses in support of the defense, it can hardly be said that the defendant has had effective assistance of counsel." Gomez v. Beto, 462 F.2d 596, 597 (5th Cir. 1972); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir.1986)(failure to adequately investigate defendant's alibi witnesses, including his mother, and to subpoena her to testify was ineffective and deprived defendant of his only defense).

(Order, Cv:DE22, p.5).  In reaching the conclusion that an evidentiary hearing was warranted, the Court further made the following findings:

> Here, the record does not reveal why trial counsel noticed only Ms.

> McDowell-Russell as an alibi witness...and stated in his opening statement that Ms. McDowell-Russell was going to testify as to Petitioner's alibi...but then failed to present the defense. The only indication in the record as to why he did not pursue the defense was his statement during closing argument that he did not present an alibi defense because the Government did not prove that defendant Russell was the captain of the boat use to transport the marijuana. However, the jury clearly disagreed with trial counsel.

(Order, Cv:DE22, pp.5-6). The Court, in concluding that evidentiary findings were required, stated:

> Moreover, even if the Court assumes that counsel's performance in failing to call the alibi witnesses to testify at trial and/or failing to investigate the witnesses "fell below an objective standard of reasonableness" under <u>Strickland</u>, an evidentiary hearing is required to determine whether there is a reasonable probability that the result [of the trial] would have been different, <u>Wellington v. Moore</u>, 14 F 3d 1256, 1262-63 (11th Cir. 2002), if the alibi witnesses had testified.

(Order, Cv:DE22, p.6). Finally, the Court [noting that "although the evidence against the Petitioner was 'Substantial'"][6] stated that

---

[6]     The Court's Order (Cv:DE22) upon re-referring the Matter for evidentiary hearing, having termed the evidence against Russell to have been "substantial," summarized the evidence, as follows, *verbatim*:

> The evidence against Petitioner consisted of the testimony of two co-conspirators, cellular telephone records, and a prescription drug bottle found in the boat used during the scheme. Co-conspirators, Delton Cash and Rocky Saunders testified that Petitioner was on the boat that transported the marijuana from the Bahamas to Miami and participated in the scheme. (DE 175; DE 176). Co-conspirator Saunders also testified that Petitioner and another co-conspirator, Phillip Taylor, used the alias "Ian White" to purchase cellular phones. (DE 176 at 59: 12-19). DEA Agent Stephen Morgan testified about his analysis of incoming and outgoing cellular phone calls between the co-conspirators during the scheme. (DE l92 at 24-108). With respect to Petitioner's alibi defense, there were two calls made from one of the Ian White cell numbers, 786-346-2713, to Marcia McDowell-Russell's cell phone at 12:33 a.m. and 12:46 a.m. on January 24, 2007, when Ms. McDowell-Russell's affidavit states Petitioner was at home and asleep with her. Both calls were answered. The 12:46 a.m.

"out of an abundance of caution, an evidentiary hearing must be held," and framed issues to be determined at the hearing, stating:

> Issues to be determined at the evidentiary hearing are: **(1)** why trial counsel abandoned the alibi defense; **(2)** whether trial counsel investigated the other alleged alibi witnesses and if not, why he failed to do so; **(3)** which alibi witnesses, if any, would have testified at trial; **(4)** the content of the alibi witnesses' testimony; and **(5)** the content and effect of cross-examination of the alibi witnesses. See Rizo v. United States, 446 Fed.Appx. 264 (11th Cir. Nov.15, 2011)(remanding for evidentiary hearing on ineffective assistance of counsel claim for failure to call and investigate alibi witnesses); Gomez, 462 F.2d at 597 (relying on testimony of alibi witnesses and trial counsel to determine whether counsel was ineffective); Wellington, 314 F.3d at 1261-1263 (relying on testimony of defense counsel, the prosecutor, and the alibi witnesses at Rule 3.850 hearing in holding that application of Strickland's prejudice prong was not objectively unreasonable in case where evidence against the defendant consisted of the testimony of two witnesses).

(Order, Cv:DE22, pp.6-7).

## C.   **Counsel, Parties and Witnesses**

-------------------------

> call connected from a cell phone tower located at 658 N.W. 99 Street in Miami. (DE l92 at 64:12-25; 65:1-2, 15-24). However, the cell phone tower that is only 1.5 miles from Russell's residence is located at 3701 Hiatus Road in Miramar. (DE 192 at 70:20-25; 7l:1-5). ln addition, the cell phone calls to Ms. McDowell-Russell were placed after co-conspirator Taylor, who also used a cell phone subscribed to Ian White, was arrested. (DE 175 at 32:21-25., 33:1). Further, on January 23, 2007 between 10:40 p.m. and 11:16 p.m., there were five calls placed from the 786-346-2713 Ian White number to another number attributed to Ian White, 786-344-5378, which show that the caller using the "2713" number was traveling north. (DE 192 at 61-64). The other evidence against Petitioner was testimony and photographs concerning the prescription drug bottle, with Petitioner's name on it, that was found on the boat. (DE 192 at 16:22-24). The boat was registered to Petitioner, but owned by co-conspirator Taylor.

(Court Order, Cv:DE22, at p.6 n.5)

### for the 8/29/2012 Evidentiary Hearing[7]

David J. Joffe, Esquire, was appointed to represent the Movant [Eugene Russell, Reg. No. 68447-004] at the hearing and all further stages of this §2255 proceeding, both before this court, and in any appellate proceedings. The Government was represented at the evidentiary hearing by Robin W. Waugh, Assistant United States Attorney ("AUSA") who was the prosecutor at Mr. Russell's trial.

### Motions/Notices Filed on 8/28/2012

On 8/28/2012, the day before the hearing, Movant Russell, through counsel, filed a Motion (Cv:DE33), indicating that on Saturday, 8/25/2012, Russell informed his attorney [Mr. Joffe] for the first time that Phillip Taylor was a potential alibi witness, and requesting that Taylor, who is incarcerated,[8] be permitted to appear telephonically at the 8/29/2012 hearing. The Government filed a Response in Opposition (Cv:DE34).

The Government also filed a Notice (CV:DE35) indicating that although Mr. Neil Nameroff, Esquire, had been subpoenaed to appear as a witness for the Evidentiary hearing, attempts by Ms. Waugh to contact Mr. Nameroff by phone and email at this office had been unsuccessful, and on 8/28/2012 Ms. Waugh learned of Mr. Nameroff's health condition, and would more fully inform the Court regarding the same at the time of the hearing.

### Announcements at the Hearing Regarding Witnesses

The evidentiary hearing was convened on Wednesday, August 29, 2012, as scheduled.

At commencement of the hearing, it was announced that it was

---

[7]   The hearing, initially set for 7/17/2012, was continued upon unopposed defense requests, to 8/7/12 due to scheduling conflict, and to 8/29/12, due to medical emergencies relating to Mr. Joffe.

[8]   BOP records reflect that inmate Phillip Taylor, Reg. No. 57120-004 is currently incarcerated at Three Rivers FCI, in Three Rivers, Texas.

anticipated that on behalf of the movant possibly 4 witnesses would be called: the Movant's wife, Marcia McDowell-Russell; Julio C. Ojeda, an investigator retained on Movant's behalf; Sandra McDowell [Movant's sister-in-law]; and the Movant himself.

The Government announced that it anticipated possibly calling DEA Special Agent Lyn Mead to testify. The Court was informed that Mr. Neil Michael Nameroff, Esquire, the Movant's attorney at trial and sentencing, is gravely ill, in hospice care, and therefore was unavailable to appear as a witness at the evidentiary hearing.

### IV  PERSONS PREVIOUSLY IDENTIFIED IN MOVANT'S §2255 PLEADINGS AS ALIBI WITNESSES, WHO WERE NOT CALLED TO TESTIFY AT THE 8/29/2012 EVIDENTIARY HEARING

Sherie McDowell-McIntosh, Movant's sister-in-law, was not called as a witness at the evidentiary hearing, where [as discussed in the intial Report she had testified at Movant's trial], and because both Mrs. McDowell-Russell's testimony and the Movant's own testimony at the 8/29/2012 evidentiary hearing indicated she was not present at the Russell home on the night of 1/23/2007 [despite indications to the contrary in the Movant's earlier §2255 filings].

Sandra McDowell, the Movant Russell's other sister-in-law also was not called as a witness at the evidentiary hearing, where Mrs. McDowell-Russell's testimony and the Movant's own testimony at the 8/29/2012 evidentiary hearing indicated that Sandra McDowell was not present at the Russell home on the night of 1/23/2007 [despite indications to the contrary in the Movant's §2255 filings].

The Russell's nephew, Vincent Jenkins [whom Movant in his §2255 filings indicated could have served as an alibi witness] was not called as an evidentiary hearing witness where, the Movant's and his wife Marcia's evidentiary hearing testimony indicated that although Vincent was living at the Russell home in January 2007, he was a

12

teenager involved in sports, who was "in and out" of the house, and was not home the entirety of the evening on 1/23/2007.

Finally, Aliah, the daughter of the Movant and his wife Marcia, was not called as an evidentiary hearing witness. At the time of the events in question [1/23/2007] she was only 5 years of age; and although she was alluded to in the unsigned first and second affidavits prepared in the name of Marcia McDowell-Russell (Exs. B and B-1, at Cv:DE7 pp. 38, and 40-41), she was not mentioned in Movant Russell's own Affidavit signed under penalty of perjury (Ex.A at Cv:DE7, p.36). Mr. Joffe stated that due to her young age at the time, the daughter Aaliyah also would not have served as an alibi witness; and Movant testified that he did not tell Mr. Nameroff that his daughter was an alibi witness.

Counsel [Mr. Joffe], when questioned by the Court, acknowledged on the record that Movant's nephew, Vincent, would likely have not been a helpful/compelling witness for Mr. Nameroff to call as an alibi witness, where Movant's and his wife's testimony was that Vincent was "in and out" and was not home all night on 1/23/2007.

## V    THE REQUEST TO ALLOW TELEPHONIC HEARING TESTIMONY BY MOVANT'S CO-DEFENDANT PHILLIP TAYLOR

As noted supra, the Movant filed a Motion (Cv:DE33) to permit his co-defendant/co-conspirator Phillip Taylor, Reg. No. 57120-004, who is incarcerated at Three Rivers FCI in Texas, to appear telephonically for the 8/29/2012 evidentiary hearing. The Motion was filed mid-day on 8/28/2012, on the eve of 8/29/2012 hearing, a matter that had been twice continued for other reasons. The Motion indicated that Movant Russell on 8/25/2012 had informed hearing counsel David J. Joffe, Esquire, that Taylor was a potential alibi witness. As noted, supra, the government filed a Response in opposition (Cv:DE34). The matter was discussed at the evidentiary hearing, and it was determined, based on the untimeliness of the

motion, and the Movant's failure to indicate in his earlier §2255 filings that he ever told his trial attorney Mr. Nameroff that Taylor might be an alibi witness, that the motion would be denied. A separate Order, entered in conjunction with this Report, serves to rule upon the Motion (Cv:DE33) which remained pending on the CM/ECF docket at the time that the 8/29/2012 hearing was conducted.

## VI   THE WITNESSES' TESTIMONY AT THE 8/29/12 EVIDENTIARY HEARING

### A.   Testimony by Marcia McDowell-Russell (Movant's Wife)

Marcia McDowell-Russell, gave testimony on direct, cross, and re-direct examination (and upon questioning by the Court).

Mrs. McDowell-Russell testified that she had multiple conversations with Mr. Nameroff, but could not recall how many, or exactly when they occurred. She related that some occurred before trial, and that those principally were concerned with payments for his services. She recalled that most of her conversations with Mr. Nameroff occurred at his office; and recalled that her husband was present for some of them. She testified that she told Mr. Nameroff she was willing to be an alibi witness for her husband. She was not 100% sure, but she believed she told him this before trial actually commenced; and she testified that that conversation did not take place at Mr. Nameroff's office, but rather at the courthouse. Mrs. McDowell-Russell testified that she was present in the courtroom when the trial was ongoing, but could not recall how much of the trial she actually attended, and stated that at a point when it was recognized that she was an alibi witness, she was asked to leave the courtroom. She further testified that Mr. Nameroff later told her that she would not be needed as an alibi witness, and that when she insisted, he told her it was not necessary "because it was a no brainer," as the evidence was not enough to prove the case against her husband. She could not recall at what point during the trial

14

that counsel said she was not needed as an alibi witness, and could not recall whether it was during the presentation of the government's case. She left, and went home to care for her daughter. She testified that she next spoke with Mr. Nameroff when he called her cell phone to advise her of the verdict against her husband.

Mrs. McDowell-Russell testified that his call about the verdict in her husband's case, it was approximately a year later when she next spoke with Mr. Nameroff. That conversation concerned a letter addressed to her husband that Nameroff had written relating to medical conditions he had suffered after trial. She testified that she had not elicited the letter from Mr. Nameroff, and that it was he who had offered to write it. [A copy of the letter previously appeared in the record as Movant's §2255 Exhibit "C" at Cv:DE7 pp.43-44; and it was moved into evidence at the 8/29/2012 Evidentiary Hearing as Petitioner's hearing Exhibit 1]. Mrs. McDowell-Russell testified that prior to receipt of the letter she was not personally aware of Mr. Nameroff's health conditions; but she said that at the time of trial she had perceived that he was "overly sweating," "nervous," "very edgy," and "just not himself." She testified that Mr. Nameroff had asked her sister Sandra to take notes for him at trial.

Mrs. McDowell-Russell testified that she could not recall if pretrial she had discussed discovery with Mr. Nameroff. She said, however, that she did discuss her relationship with or knowledge of two of her husband's co-defendants, Saunders and Taylor, both of whom she acknowledged that she knew. She testified that she did not know four of her husband's other co-defendants [Cash, King, and the two Morleys].

When questioned about what she had told Mr. Nameroff concerning the day of 1/23/2007, Mrs. McDowell-Russell testified that she and he had not discussed the events of that day, and discussed "just for me to be the alibi"... "but not the actual case." When further

questioned, she testified that she told Nameroff that her husband Eugene was home, and that if called as an alibi witness she would have testified that her husband was home on the evening of 1/23/2007. She was asked to be more specific about what was happening, other than saying that he was home, i.e. was she watching TV, or was something else occurring. A government objection that counsel was leading the witness was sustained, and the Court admonished that it wanted to hear the witness testify. Mrs. McDowell-Russell continued, stating that from memory "which my memory is not that great, I would say he was home." She added that on a "normal Wednesday night, sir I would watch American Idol and he [her husband Eugene] would be normally [watching the] sports channel. He was home."  When pressed for further details, and was asked what she did on the day of 1/23/2007, Mrs. McDowell-Russell testified that she remembered "coming home from work, cooking, living my life." When asked to be specific about time elements, she testified that she got home from work at about 5:30 p.m. When asked who was there, she said, "Eugene," "myself," "my daughter," and "I'm not sure my nephew was there." He was 16 or 17 years old, and played sports at night. When asked, "did anybody else arrive?", she testified, "Not from what I remember, no;" and she testified that she related that to Mr. Nameroff. Mrs. McDowell-Russell further testified that after she came home at 5:30 she did not leave the house at any point on 1/23/2007. She testified, however, that her husband Eugene left the house for about 45 minutes, and drove himself to a Walgreens located about 5 minutes from their house to get some Ibuprofen. She did not go with him because he had "annoyed" her and she "didn't want to go."  She was unable to recall at what time her husband had left the house and could not recall at what time he returned, but said he was gone "less than an hour."  She further testified that she was awake when he returned. Mrs. McDowell-Russell testified that she could not recall at what time she had gone to sleep on the night of 1/23/2007. Finally, when questioned by the Court, she testified that it was her routine to go to bed "very late." When pointedly asked by the Court if her

16

husband had joined her and had gone to bed with her at the same time that she went to bed, she testified that she and her husband did not go to bed together on 1/23/2007, and that that night he had stayed on the couch when she retired.

Mrs. McDowell-Russell was asked why she recalled that her husband was home on the night of 1/23/2007, and she said "because he was sick." In regard other questioning about her husband's medical condition, she testified that on Christmas day he had suffered an episode in which she had to take him to the Emergency Room, and was told that he was within 2 hours of going into a diabetic coma. She also testified that her husband suffered from gout, and suffered leg pain, and that as a result he used a crutch to get about, but did it in private because he didn't like to be seen relying on it, and would prefer to hop around rather than using physical support. When asked what her husband would do when he was in pain in their residence, Mrs. McDowell-Russell said "he would have to be on Ibuprofen." When asked if he would sit on the bed, and asked what he would be doing, she testified that he would sit "on the couch... with his leg up watching sports." When asked if she brought dinner home with her on 1/23/2007 or cooked dinner that evening, she testified that she made dinner; and when asked how many people ate dinner at the house that evening, she responded "Myself, my daughter, and Eugene." Mrs McDowell-Russell further testified that although he was home sick on the night of 1/23/2007, her husband Eugene did drive himself to the drug store that evening. She further testified that the next morning, on 1/24/2007, her husband drove their vehicle and dropped her off at work. She also testified that on 1/24/2007 Philip Taylor's wife called the cell phone and had asked to speak with her husband, Eugene.

In yet another area of examination, Mrs. McDowell-Russell testified that before trial she recalled two agents coming to her home on a morning when she was leaving for work. She encountered them outside the house. One of them asked if her husband was home, and

she said "Yes." When asked if she recalled the name of the agent who had spoken with her, she said she did not know his name, but she positively identified him as "the guy sitting with Ms. Waugh" [i.e. Agent Lyn Mead, who was present in the courtroom for the evidentiary hearing, along with AUSA Robin Waugh, who had indicated that the Agent might possibly be called as a witness for purposes of proffering certain records into evidence at the evidentiary hearing]. Mrs. McDowell-Russell testified that the other agent who went to her home was "a black guy." She testified that she was running late for work, and said so to the agents. She said they did not prevent her from going to work, and that she told them she had to go, and that they could call and talk to her attorney. She testified that the next time she talked to an agent was at the courthouse. When further questioned about the encounter with agents at her home, and her in-court identification of Agent Mead, Mrs. McDowell-Russell testified that she believed that Mead was the same agent who was present at her trial. When asked if she was sure, she responded, "I want to say a hundred percent sure. The hair is just different."

Movant's wife also was questioned about her cell phone and its use. She testified that its number was (305) 308-7170, and that she had the phone both before and during trial. Mrs. McDowell-Russell was asked if during January 2007 she had used her cell phone to communicate with her husband Eugene, and said that she had not, and explained that she had not done so because he had her cell phone.

Mrs. McDowell-Russell was also questioned about the unexecuted affidavits submitted by her husband bearing her name, in support of his §2255 Motion, in which it was stated that on 1/23/2007 she was home with her husband [who was "ailing from Gout, in pain and unable to walk at the time"], along with her nephew Vincent and her daughter Aaliyah; stating that her sister Sherie had arrived at the house at 6:00 p.m. to check on her husband's Gout condition that had gotten "progressively...worst since the weekend;" that her other sister Sandra had arrived at 7:00 p.m., and that they all had

18

watched American Idol together until about 10:00 p.m., and that she had stayed with her husband until we both went to sleep after midnight." Mrs. McDowell-Russell was asked if she had prepared any kind of affidavit in connection with her husband's §2255 petition and she said, "No." As a follow-up, she was asked, "If there was any affidavit that was attached [to] any petition it would not have been written by you?," and she responded "No."

## B. __Testimony by Investigator Julio C. Ojeda__

Julio C. Ojeda, an Investigator hired on Movant's behalf by Attorney Joffe, testified on direct and cross examination.

Mr. Ojeda testified that he obtained a phone number for Attorney Nameroff from a Florida Bar related database and was able to contact him telephonically. Investigator Ojeda testified that he had two conversations with Mr. Nameroff, the first on 5/17/2012, and the second on 8/21/2012.[9]  Ojeda testified that during the May conversation he introduced himself to Mr. Nameroff as being retained by Mr. Joffe in conjunction with the §2255 proceeding relating to Eugene Russell's underlying criminal case. Mr. Ojeda testified that Mr. Nameroff declined to give him his address, and told him that he was going into Hospice care. Ojeda testified that he perceived Mr. Nameroff at the time to be coherent. When asked what Mr. Nameroff told him, Ojeda testified that Nameroff said he remembered defendant Russell, that his case was the last one he had defended, and that with regard to the issue of Russell's alibi defense there was only 1 person, Movant Russell's wife, Marcia, who had been identified or provided to him as a potential alibi witness, and that ultimately he had decided not to use her testimony because she had lied to him, and he found her not to be credible. Mr. Ojeda stated that Attorney Nameroff, during that 5/17/2012 conversation, provided no detail about what Movant's wife had said that caused him not to rely upon

---

[9]     The witness first testified that the second conversation was on 8/23/2012, but corrected himself and stated that it occurred on 8/21/2012.

her as a witness.

Mr. Ojeda testified that upon his second call to Mr. Nameroff in August 2012, Mr. Nameroff answered the phone, but sounded weak, and hung up. Mr. Ojeda called again the same day, and Mr. Nameroff answered. When Ojeda refreshed his memory, Mr. Nameroff indicated that he remembered the case; Mr. Ojeda inquired if Mr. Nameroff might give a sworn statement in writing or by video, but he indicated that he was too ill, in late stages of Hospice care.

Mr. Ojeda also testified that he was unable to identify and contact the doctor who had been Mr. Nameroff's physician.

As the undersigned indicated from the bench during the evidentiary hearing, for purposes of these §2255 proceedings and the evidentiary hearing, the Court declines to give any weight to the testimony elicited through Investigator Ojeda about what Mr. Nameroff said to him telephonically concerning potential alibi witnesses, and concerning why Mr. Nameroff chose not to rely on Movant's wife as a witness; as the testimony is hearsay, and Mr. Namberoff was unavailable for examination in open court.

## C. Testimony by the Movant Eugene Russell

Movant Russell gave testimony on direct and cross examination (and upon questioning by the Court).

At commencement of his 8/29/2012 hearing testimony, Eugene Russell testified that although he had help [from a non-lawyer in prison] writing documents that he submitted in support of his §2255 Motion, he had personally read and approved them. With regard to the contents of his own Affidavit which was sworn under penalty of perjury and submitted with his §2255 Motion (Ex.A at Cv:DE7 p.36), Russell was shown a signed copy of his Affidavit that was submitted with his §2255 Motion, and acknowledged that the Affidavit was his, and that he had signed it on 3/11/11. Russell further acknowledged

that statements by him therein regarding who was present at his house on the evening of 1/23/2007 were untrue. Russell had stated in the Affidavit (Ex.A) that he had told Attorney Nameroff that he was at home on 1/23/2007 "ill with gout and unable to walk," and that his wife was present with him at home, along with her two sisters (Sherie and Sandra) in addition to Vincent Jenkins [his nephew], and he therefore told Mr. Nameroff to "investigate and call to court all the alibi witnesses I mentioned to him." Russell at the 8/29/2012 Evidentiary Hearing, however, admitted that his affidavit sworn under penalty of perjury contained untruths, explicitly admitting on the record that neither of his wife's two sisters was present at the Russell home on the night of 1/23/2007. Russell also testified [when confronted with his wife's testimony that she could not specifically recall that their nephew Vincent was present at the Russell residence] that his nephew was "in and out," and that it was true that he was playing sports, and would come home from school, and then head out to the park to play football. Russell did not testify either that Vincent was home the entire evening with him, or provide any details about when Vincent was there or when he was gone, to the extent that it was Movant's testimony that Vincent was "in and out." Russell expressly testified that he did not ever discuss with his attorney, Mr. Nameroff, using his 5 year old daughter as an alibi witness.

Insofar as Russell at the evidentiary hearing testified that that he also told Attorney Nameroff that Phillip Taylor would be a witness for him [in addition to family members], he was asked how he discussed this with counsel. Russell said that "he could have testified that I was not the captain of the vessel." When asked, "Would Phillip Taylor testify you were not on the vessel?", Russell responded, "Yes. Sir." When asked where Taylor was on 1/23/2007, Russell stated: "he was arrested on that day." When asked if Taylor was arrested "on the boat," Russell responded, "No." Russell was asked where Taylor was arrested, and he said "I think he was at Dinner Key Marina;" and when asked how he knew this, Russell re-

sponded that he learned it from "my discovery." When asked why he told Mr. Nameroff that he wanted Phillip Taylor as a witness, he testified that he told counsel "the vessel was Phillip Taylor's" and that Taylor "could identify who was the owner of the vessel." Russell, when further questioned, admitted at the 8/29/2012 evidentiary hearing that he never had discussed with Phillip Taylor his ability to testify as an alibi witness on his behalf, and admitted that he had never communicated with Phillip Taylor in writing.

### D.   **Testimony by DEA Agent Mead**

Agent Mead, called as witness by the government, gave testimony on direct examination. He testified that he has been a DEA Agent for 6 years; that he has been assigned to Enforcement Group 6 for 1½ years, since 2010; and that he is familiar with the Russell case, but only because it was Re-assigned to him in the latter part of the case, during which there were three outstanding potential defendants, only one of whom has since been indicted.  Agent Mead testified that he was not involved in the investigation, and the trial of Russell and his co-conspirators; and further testified that he does not know the Movant Russell's wife [Mrs. Marcia McDowell-Russell], and that he had never seen her prior to 8/29/2012 when they were both present at the Evidentiary Hearing in this case.

### VII   **FINDINGS OF FACT, AND CONCLUSIONS OF LAW**

The Undersigned, after careful consideration of the Movant's written allegations, and the testimony of the witnesses at the evidentiary hearing conducted on 8/29/12, makes the following findings of fact, and conclusions of law, pertaining to the claims raised by Movant Russell, that his former attorney, Neil Michael Nameroff, Esquire, was ineffective: (1) for failing to pursue an alibi defense in Russell's case, after filing a Notice of Alibi (Cr:DE80), and announcing during opening argument that Russell intended to rely on an Alibi; and (2) for allegedly failing to properly conduct pretrial investigation, where Russell gave counsel names of no less than 4 potential witnesses whom he contended could

22

testify that they were with the defendant/Movant Russell [who was suffering from gout, and allegedly incapacitated - unable to walk] at his home, on the evening of 1/23/07, at the time that the boat bearing drugs which were the subject of the charges in the indictment arrived a Coconut Grove and the drugs were off loaded into a van, while law enforcement officers were conducting surveillance at the scene.

## Credibility of Witnesses

After careful consideration of the testimony of the Movant Russell and close observation of his demeanor upon direct and cross examination by hearing counsel and upon questioning by the Court; upon consideration of Movant's submission of unsigned affidavits in his wife's name (Exs. B and B-1) which evidence shows she did not author, but which were designed to be consistent with Movant's own signed Affidavit (Ex.A); and upon further consideration of inconsistencies between Movant's 8/29/12 hearing testimony and statements in his own sworn Affidavit (Ex.A), and Movant's admission at the 8/29/2012 Evidentiary Hearing that his Affidavit contained untrue or perjured statements, and taking into account the respective interests of the parties in the outcome of this proceeding, the undersigned finds Movant Russell to not be a credible witness, and finds his evidentiary hearing testimony to be wholly unreliable.

After careful consideration of the testimony of Movant's wife, Marcia McDowell-Russell, and close observation of her demeanor on direct, cross, and re-direct examination (and upon questioning by the Court), and upon consideration of vagueness of her testimony and her inability to provide details regarding exact times/events on the evening of 1/23/2007, taking into account inconsistencies between Mrs. McDowell-Russell's testimony and that of DEA Agent Lyn Mead, and taking into account the respective interests of the parties in the outcome of this proceeding, the undersigned finds the testimony by the witness Marcia McDowell-Russell at the 8/29/12 evidentiary hearing to have been less than reliable, and less than credible.

Based on the Court's careful observation and consideration of the testimony of the DEA Agent, Mr. Lyn Mead, called to testify by the government, and taking into account the respective interests of the parties in the outcome of this proceeding, the undersigned finds Mr. Mead's testimony to be forthright and 100% credible.

### Findings

As noted <u>supra</u>, 5 issues were outlined for determination at the evidentiary hearing: **(1)** why trial counsel abandoned the alibi defense; **(2)** whether trial counsel investigated the other alleged alibi witnesses and if not, why he failed to do so; **(3)** which alibi witnesses, if any, would have testified at trial; **(4)** the content of the alibi witnesses' testimony; and **(5)** the content and effect of cross-examination of the alibi witnesses. (Order of Re-Referral, Cv:DE22, pp.6-7, citing <u>Rizo v. United States</u>). The Court cannot make a determination regarding the first two issues, because Attorney Neil Nameroff, whose testimony on direct and cross examination would be necessary to shed light on those two matters, was unavailable to give testimony.

Nonetheless, the testimony given by witnesses at the 8/29/2012 evidentiary hearing, including the Movant himself, and his wife Marcia, together with the absence of testimony by others [his sisters-in-law and nephew] about whom Russell claims he told Mr. Nameroff before trial, and whom Movant Russell in his §2255 pleadings had claimed could provide him an alibi, together with the prior record in the underlying criminal case, provides the Court with more than sufficient evidence upon which to reach a determination regarding whether or not Movant's prior attorney Mr. Nameroff could be deemed ineffective for failing to investigate and call identified alibi witnesses in his client's behalf.

### Movant's Sisters-in-law (Sherie and Sandra)

The undersigned finds that, despite Movant Russell's sworn §2255 Affidavit stating the contrary, based on Russell's and his

24

wife Marcia's hearing testimony, neither of Movant's sisters-in-law (Sherie, or Sandra) was present at the Russell home on 1/23/2007 as Movant has alleged, and accordingly they could not have been called and available to serve as alibi witnesses for him. Counsel therefore cannot have been ineffective for not calling them.

### Movant's Nephew (Vincent)

The undersigned finds that, notwithstanding Movant's insistence that he told Mr. Nameroff about his nephew Vincent Jenkins, it is apparent from both Movant Russell's and his wife Marcia's hearing testimony that despite their indication that Jenkins was living in their home, he was generally "in and out" on a regular basis after school, due to his participation in sports. Neither Movant Russell nor his wife Marcia was able to state precisely whether Jenkins was home on the night of 1/23/2007, or when he may have come and gone from the Russell house on the day/evening in question. The evidence indicates that Jenkins did not partake of the evening meal which Mrs. McDowell-Russell states she prepared on the night of 1/23/2007. There is no evidence to suggest that Jenkins could have testified that he was in his uncle's presence the entirety of the evening when Movant claims he was home and not participating in offenses for which he was charged and convicted. Vincent Jenkins was not called by hearing counsel as a witness for the evidentiary hearing. The undersigned finds that even if assuming *arguendo* Attorney Nameroff had been advised by his client Russell that Jenkins could serve as an effective alibi witness, it is unlikely that Mr. Nameroff would have relied upon him and called him to testify at his uncle's trial. Further, the evidence of record suggests that even if Mr. Nameroff had called the nephew Vincent Jenkins to testify, he could not have provided compelling testimony that would have withstood cross-examination so as to convince a jury that his uncle was home on the evening of 1/23/2007, where the Movant's and his wife's evidentiary hearing testimony indicated that they themselves were unsure when and if his nephew came home, and when and if he left the house on 1/23/2007. Under these circumstances, Mr. Nameroff could not be

deemed ineffective for not calling Vincent Jenkins as an alibi wit-
ness if, indeed, the Movant Russell spoke to counsel about him being
a potential witness, as Russell would have the court believe.

### Movant's Wife (Marcia)

Of the relatives named by the Movant Russell in his Affidavit
and §2255 pleadings submitted prior to the evidentiary hearing as
being identified to counsel (Attorney Nameroff) as alibi witnesses
whom he should investigate and call to testify on Russell's behalf,
this leaves only the Movant's wife. As discussed in the prior Report
and the Court's Order of Re-Referral, the record shows that Attorney
Nameroff did consider Movant's wife as a potential alibi witness,
having filed a Notice identifying her as such, and mentioning her
in opening remarks. The trial record also shows that Mr. Nameroff
made a strategic decision not to call Movant's wife, explaining to
the jury at closing that he had not done so, as it was unnecessary
because the government had not met its burden of proof.

Marcia McDowell-Russell's 8/29/2012 hearing testimony demon-
strates that she was unable to provide specifics regarding times,
or specifics about precisely what she and her husband did on the
night of 1/23/2007. She testified in the broadest of terms, that her
husband was home on the night in question, and that he was sick. Her
testimony, however, included that her husband had indeed left the
house on the night of 1/23/2007, albeit only for about 45 minutes
to an hour [according to both of them]. She could not state when he
left and when he returned. Her testimony indicated that her husband
(who has contended that he was so incapacitated from gout that he
could not walk and had to have his sister-in-law Sherie come to
"assist [him] with [his] gout at the request of his wife" on the
night that criminal offenses he was charged with were committed) was
well enough to drive the family car on the evening of 1/23/2007, and
also was well enough to drive her to work the next day on 1/24/2007.
Her testimony indicated, generally, that when they were home at the
same time, they watched separate programing on separate televisions;

there was no testimony, however, that they spent the whole evening together on 1/23/2007 watching the same program or programs; and during testimony that was equivocal, or, if not that, lacking in ability to place events in temporal context, she testified that she had gone to bed, at an unspecified time, and that her husband was left elsewhere in the house, alone, watching TV. There is, in addition, the consideration that a reasonable jury may tend to discount or not put much stock in defendants' spouses' testimony purporting to provide an alibi exonerating their partner of culpability for offenses for which he/she has been charged.

The undersigned finds, based on the hearing testimony of record, that under circumstances indicated above, any reasonable attorney could have made a strategic decision to not call his client's spouse to testify as an alibi witness. It is clear, for reasons discussed above, that apart from reasons articulated by Attorney Nameroff at closing argument for not calling Movant's wife Marcia to testify, after initially indicating that she would be called, there was ample cause for a reasonable attorney not to rely upon her as a witness, given her inability to recall and provide detailed facts regarding the events of 1/23/2007 and the timing of those events involving her husband, so as to provide testimony of an alibi that would have been compelling and would have convinced a jury that her husband could not have participated in and was innocent of the offenses with which he was charged. The undersigned finds that even if Mr. Nameroff had chosen to call Marcia McDowell-Russell to testify on her husband's behalf, she would not have been a compelling witness. Her testimony would have been subject to vigorous cross-examination, and given her inability to provide details about the her and her husband's activities on the night in question, it is highly unlikely that her testimony would have convinced a jury that her husband was home on the evening of 1/23/2007, and that she was with him, so as to convince a reasonable jury that the Movant was in his house as he claims, and could not have participated in the offenses for which he was charged and convicted.

27

### Movant's Co-Defendant (Phillip Taylor)

Finally, the undersigned finds the Movant's belated assertion that he told Attorney Nameroff that his co-defendant Phillip Taylor could serve as an alibi witness, to be lacking in veracity.  Russell admitted to this Court on 8/29/2012 that he had never spoken or otherwise communicated with Taylor about his willingness to ability to testify on his behalf. Moreover, the Movant knew of Taylor prior to and at the time of his trial, yet before an evidentiary hearing in this case was set, there was nothing from the Movant to indicate that he told Mr. Nameroff to call Taylor as a witness for him. Movant Russell's Affidavit (Ex.A) submitted in March 2011, made no mention of Taylor being even a potential alibi witness or mention of Russell having discussed this with Mr. Nameroff.  In light of this, the undersigned finds that Mr. Nameroff cannot be deemed ineffective for not investigating and not calling Taylor as a witness to testify for Russell at the time of his trial.

### <u>CONCLUSIONS</u>

Thus, for the reasons discussed above, it is the conclusion of the undersigned, after receiving and considering the above refer-enced evidence adduced at the hearing conducted on 8/29/2012, and after considering the substantial evidence of Movant's guilt [as discussed in the prior Report, in the Court's Order of Re-Referral, and in the Eleventh Circuit's opinion affirming his conviction, <u>United States v. Dwighte Morley, Eugene Russell</u>, No. 08-14666, 353 Fed.Appx. 256, 2009 WL 3824790 (11 Cir., Nov. 17, 2009)], that the Movant Russell's former defense counsel, Mr. Neil Michael Nameroff, Esquire, cannot be deemed to have provided ineffective assistance under the standard enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), either for failing to investigate and call alibi witnes-ses as Movant alleges, or for failing to raise/pursue an alibi de-fense at trial after initially indicating that he would do so. It is the conclusion of the undersigned, after conducting the evidenti-

ary hearing requested by Movant and granted by the District Court, that there is not a reasonable probability that the result of the Defendant/Movant Eugene Russell's trial would have been different, even if his wife Marcia, and/or his nephew Vincent had been called to testify on his behalf. See Wellington v. Moore, 14 F.3d 1256, 1262-63 (11 Cir. 2002). It is the further conclusion of the undersigned, that under the circumstances of his client's case, the decision by Attorney Nameroff not to pursue the initially anticipated alibi defense was a reasonable strategic decision. See Perkins v. Comm'r of Corr. Serv., 218 F. App'x 24, 26, 2007 WL 627515, at *2 (2 Cir., Feb. 23, 2007) (holding in case where petitioner challenged as ineffective assistance his attorney's decision not to call as alibi witnesses petitioner's aunt and father, when seen in the context of counsel's vigorous attack on the reliability of the identification of petitioner by the only eyewitness, was not ineffective assistance, and finding that counsel's actions fell within "the wide range of professionally competent assistance") (quoting Strickland, supra, 466 U.S. at 690)); Headley v. Ercole, No. 07-CV-979, 2010 WL 3808685 at *8 (N.D.N.Y. Sept. 22, 2010) (trial counsel not ineffective for foregoing a possible alibi defense and instead "pursu[ing] a strong alternative theory by focusing on the lack of physical evidence, the suspiciousness of Petitioner's 'confession,' and the unsavoriness of the prosecution's witnesses"); Bennett v. Fischer, No. 02 CV 5232, 2006 WL 1084772 at *17 (E.D.N.Y. Apr. 25, 2006)(by deciding to abandon an alibi defense after "one damaging alibi witness" testified, defense counsel "wisely avoided putting the defense in a position of weakness, and concentrated instead on aggressively attacking what he believed to be the prosecution's weak case"); People v. Charleston, 161 A.D.2d 544, 545, 556 N.Y. S.2d 48, 49 (1st Dep't) ("[T]he fact that [defense counsel] attempted to exploit weaknesses in the prosecution's eyewitnesses rather than to search for [an allegedly exculpatory] witness whose character might also be subject to possible disparagement is not an unreasonable tactical decision."), appeal denied, 76 N.Y.2d 854, 560 N.Y.S.2d 993 (1990).

## VIII   <u>RECOMMENDATION</u>

It is therefore recommended, upon Re-Referral of the case for the evidentiary hearing on Grounds "I(1)" and "I(2)" of Movant's Motion to Vacate pursuant to 28 U.S.C. §2255, which was held on August 29, 2012, that: (1) the Motion to Vacate be denied as to those claims; (2) the Court having previously denied relief on all of the Movant's other Grounds and subclaims for §2255 relief, the Motion to Vacate (Cv:DE1) should be denied in its entirety; and (3) this case should be closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated: August <u>31</u><sup>st</sup>,  2012.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  David J. Joffe, Esquire
     Attorney for Movant
     One East Broward Blvd., Suite 700
     Fort Lauderdale, FL 33301


     Robin W. Waugh, AUSA
     United States Attorney's Office
     Major Crimes Section
     99 NE 4th Street, 6th Floor
     Miami, FL 33132